UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CREDIT SUISSE SECURITIES (USA) LLC,

                Petitioner,

- against -

BRUCE LEE, JAMES HOESLEY, EMIKO
NEITHERCUT, KATHLEEN GOULD, and
JULIE GRIFFITH,

                Respondents.

11 Civ. 08566 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      The petitioner in this action, Credit Suisse Securities (USA) LLC ("Credit Suisse"), moves for a preliminary injunction against respondents Bruce Lee, James Hoesley, Emiko Neithercut, Kathleen Gould, and Julie Griffith.  Respondents are all former employees of Credit Suisse who left Credit Suisse to work for Merrill Lynch.  Credit Suisse seeks a preliminary injunction that (1) prohibits Lee and Hoesley from continuing employment with any entity other than Credit Suisse for ninety days from the date of their resignation, (2) prohibits Lee and Hoesley from (a) soliciting any client of Credit Suisse to transfer its business from Credit Suisse to any other entity and (b) soliciting any employee of Credit Suisse to leave Credit Suisse to work for another entity, and (3) requires all respondents to return to Credit Suisse any confidential or proprietary Credit Suisse information they may have.  The parties agree that the underlying merits of their dispute will be decided in an arbitration proceeding held before the Financial Industry Regulatory Authority ("FINRA"), and Credit Suisse has reported to the Court that it filed such an arbitration on December 8, 2011.  Credit Suisse seeks this preliminary injunction to preserve the status quo pending the arbitration.  A hearing was held on December 7,

2011 at which respondents Neithercut, Hoesley, and Lee testified. For the reasons that follow, the motion is DENIED.

## BACKGROUND

Until October 28, 2011, respondents were employees of Credit Suisse. Lee and Hoesley served as Managing Directors in Credit Suisse's Private Banking division. Managing Director is one of the most senior titles an employee of Credit Suisse may hold. Neithercut served as a business analyst and reported to Lee. Gould and Griffith served as relationship associates and also reported to Lee. Together, Lee and Hoesley managed over $100 million in client assets for Credit Suisse.

All five respondents resigned from Credit Suisse on Friday, October 28, 2011. They began working at Merrill Lynch on Monday, October 31, 2011 and met with at least one of their Credit Suisse clients at Merrill Lynch on that day. At present, approximately eighty of the respondents' former Credit Suisse clients have transferred all or part of their accounts to Merrill Lynch. The assets of those eighty clients, however, represent less than half of the total client assets that Lee and Hoesley managed while at Credit Suisse. Of the Credit Suisse clients that have not yet transferred their assets to Merrill Lynch, many of them remain "in play."

Some of the circumstances leading up to the respondents' resignation are unclear. For example, while Lee, Hoesley and Neithercut each were aware that the others were considering moving to Merrill Lynch, none admitted to having any detailed discussions about the move with any of the other respondents, or that the decision to move was made jointly.

Certain events, however, are not disputed. On October 20, 2011, Neithercut, using her Credit Suisse email account, compiled short biographies of each of the respondents and sent them to Merrill Lynch. (*See* PX 18.) Neithercut testified that she did so at the suggestion of a

Merrill Lynch employee. Neithercut, however, also testified that at the time she sent the email, she had not yet decided whether to join Merrill Lynch because she had not yet received an offer of employment from the firm.

Neithercut also emailed to her personal email address (and possibly to Merrill Lynch) a list of mutual fund ticker symbols and the names of three hedge funds, along with a dollar figure representing the total quantity of assets that Lee's clients had invested in those funds. The email did not contain any information specific to any client accounts.

In the week prior to respondents' resignation, Neithercut sent a number of emails to Credit Suisse "back office" employees requesting that they generate periodic performance reports for certain client accounts. Neithercut and Lee testified that these requests were made in the normal course of business. However, there is some reason to believe that absent their pending resignation, respondents would not have sought these reports with the same urgency. Indeed, Neithercut admitted that in one of her emails, she told a back office employee that she needed the report generated because Lee had a meeting with the client at the end of the week. In fact, no such meeting was ever scheduled. Instead, respondents resigned at the end of that week.

Once the reports were generated, Neithercut sent them to the respective clients and cc'd Lee on his Credit Suisse email account. Respondents did not send copies of the reports to their personal email accounts nor did they otherwise take them from Credit Suisse after they resigned.

Prior to their resignation, respondents scheduled meetings with three of their clients to be held the week after respondents resigned from Credit Suisse, although Lee testified that the clients contacted *him* to schedule the meetings and that they were scheduled for that week in the normal course of business.

3

Hoesley testified that he met with one of his clients on Tuesday, October 25, three days before resigning.  Hoesley testified that during the meeting he expressed dissatisfaction with Credit Suisse and informed his client that he may be leaving the firm.  He expressly denied that he solicited the client to follow him to Merrill Lynch.  On the present record, his testimony on this point appears credible.  The next day, that client emailed Lee and Hoesley and inquired about whether his account was "portable" and about what fees would be associated with moving it.  Hoesley and Lee testified that they discussed this email, but claimed that neither of them understood what the client was referring to and that they did not follow up on the issue.  It would appear that both Lee and Hoesley necessarily understood the context in which the client's inquiry was made; however, there is no evidence that they took any steps to pursue this opportunity while still at Credit Suisse.

Lee testified that he occasionally would email Credit Suisse information to his own email account in order to work from home.  Lee testified that he was unaware that Credit Suisse policy prohibited such actions.  Lee also testified that on December 3, in preparation for the hearing on this preliminary injunction, he discovered on his home computer an email to his personal account from respondent Gould that included as an attachment a statement showing one of his client's portfolios.  The email was dated September 21, 2011.  Lee testified that while he deleted the email after reading it, the file remained on his computer but that it had not been opened since September 21.  Lee testified that the reason for the email was because Lee had scheduled a conference call with that client for September 21 which Lee intended to conduct from home.  Lee's testimony on this point appears credible.

At Credit Suisse, Lee and Hoesley each were subject to certain restrictions on their employment.  They were required to give ninety days notice before terminating their

4

employment and also were required to refrain from soliciting clients for sixty days following the ninety day notice period. Lee and Hoesley also were subject to Credit Suisse's policies regarding confidentiality of its proprietary information.

Both Credit Suisse and Merrill Lynch, however, are parties to the Protocol for Broker Recruiting (the "Protocol"), which sets forth certain rules and privileges in situations, like this one, involving brokers (otherwise known as Registered Representatives, or "RRs") who move from one firm to another. The Protocol provides, "If departing RRs and then new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm." (Protocol for Broker Recruiting ("Protocol") at 1.[1]) The Protocol also provides that its "principal goal . . . is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms." (*Id.*) The Protocol permits departing brokers to take with them only limited information, specifically "client name, phone number, email address, and account title of the clients that they serviced while at the firm." (*Id.*) Departing brokers are prohibited from taking other kinds of client information.

The Protocol further provides, "RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms." (*Id.* at 2.) Thus, where a broker leaves one signatory firm to join another signatory firm, the broker will be permitted immediately to solicit his or her former clients notwithstanding any non-solicitation agreement to the contrary, provided that the broker complies with the terms of the Protocol (i.e. does not take with him or her any client information

---

[1] A copy of the Protocol is attached as Exhibit C to the Declaration of Brian J. Burns in Opposition to Petitioner's Motion for Preliminary Injunctive Relief.

not expressly authorized in the Protocol).  There appears to be some ambiguity about whether the Protocol also trumps provisions, like the ninety day notice provisions in Lee's and Hoesley's employment agreements, that require an employee to give notice of his or her termination.[2]  At the hearing, however, Credit Suisse limited its argument to the proposition that it was entitled to injunctive relief *because* respondents violated the Protocol.

While the Protocol provides a substantial benefit to a departing broker, it does not immunize the departing broker from all liability to his former firm.  By its terms, the Protocol only absolves a departing broker from liability for conduct relating to "the RRs taking the information identified [in the Protocol] or the solicitation of the clients serviced by the RR at his or her prior firm." (*Id.* at 1.)  In other words, a departing broker could invoke the protections of the Protocol to avoid liability to his prior firm arising out of his solicitation of his former firm's clients but nonetheless remain liable to his former employer for other wrongful conduct.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 empowers a district court to issue a preliminary injunction on notice to the adverse party.  *See* Fed. R. Civ. P. 65(a).  "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion."  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (emphasis in original).  "In order to justify a preliminary injunction, a movant must demonstrate 1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest weighs in favor of granting an injunction."  *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (quotation marks and internal citation omitted).

---

[2] Neither party has submitted evidence of industry practice on this point.

**DISCUSSION**

The parties agree that if the respondents did not breach the Protocol, then no preliminary injunction would be necessary.[3] *See Merrill Lynch, Pierce, Fenner, & Smith v. Reidy*, 477 F. Supp. 2d 472, 477 (D. Conn. 2007) (denying motion for preliminary injunction where Merrill Lynch was unable to show that the defendants violated the Protocol). Accordingly, the Court addresses first whether the respondents complied with the Protocol.

Credit Suisse contends that the respondents breached the Protocol by (1) soliciting clients prior to their resignation from Credit Suisse, (2) taking information from Credit Suisse outside the bounds of information permitted by the Protocol, and (3) using Credit Suisse resources to expedite the production of clients' performance reports, which respondents subsequently sent to those individual clients.

With respect to the first issue, Credit Suisse has not produced sufficient evidence at this juncture to support the conclusion that any of the respondents actually solicited clients to move with them to Merrill Lynch prior to their resignation. Credit Suisse has shown that Hoesley met with one client three days before resigning, that Hoesley expressed dissatisfaction with Credit Suisse to that client, and that Hoesley informed the client that he may leave Credit Suisse. Hoesley denies that he solicited the client at the meeting. As evidence to the contrary, Credit Suisse points to an email the client sent to Lee and Hoesley the following day regarding the "portability" of his account and the fees associated with transferring it to another firm. That

---

[3] In a sense, the issue of whether the respondents complied with the Protocol goes to the issue of whether Credit Suisse will suffer irreparable harm absent an injunction. If the respondents did not breach the Protocol, then the conduct Credit Suisse seeks to enjoin would, even in Credit Suisse's view, be permissible. It is hard to conclude that a party will suffer irreparable harm when the conduct sought to be enjoined is concededly permissible. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Baxter*, 2009 WL 960773, at *5 (D. Utah 2008) (discussing the Protocol and stating, in a case where only the defendants' former firm and not their new firm was a signatory to the Protocol, "By agreeing to a procedure for departing brokers to take and use client contact information, 'Merrill tacitly accepts that such an occurrence does not cause irreparable harm'" (quoting *Merrill Lynch v. Brennan*, 2007 WL 632904, at *2 (N.D. Ohio Feb. 23, 2007))); *Smith Barney Div. of Citigroup Global Markets Inc. v. Griffin*, 2008 WL 325269, at *5-*6 (Mass. Super. 2008).

email, however, does not seriously undermine Hoesley's assertion that he did not solicit the client at that meeting, an assertion that the Court finds credible.  Indeed, if Hoesley had asked the client to transfer his account at the meeting, one reasonably might expect Hoesley to have addressed the precise issues raised in the email in order to allay the client's concerns about the hassle and cost of transferring a large account.  While the Court has some doubt about the credibility of Lee and Hoesley's assertion that they essentially "shrugged off" the client's email, Credit Suisse has produced no evidence to suggest that Lee and Hoesley's real response was to solicit the client to move his account to Merrill Lynch prior to their departure from Credit Suisse.

     Credit Suisse also contends that respondents took information beyond what the Protocol permits.  In that regard, Credit Suisse points to (1) two emails that Neithercut sent to her personal email account containing (a) a list of mutual fund ticker symbols, and (b) the names of three hedge funds and the aggregate amount of assets that Lee's clients had invested in each one, and (2) a file that Lee discovered on his home computer on December 3, 2011 that contained a document relating to a Credit Suisse client's portfolio.

     With respect to Neithercut's emails to her personal account, the information contained therein is insufficient to show a violation of the Protocol.  The Protocol requires signatories to adhere to it in "good faith" and provides that a broker will "be deemed in compliance" so long as the broker "substantially complied with the requirement that only" the limited information listed in the Protocol be taken with the broker upon her departure. (Protocol at 1.)  The information Neithercut emailed to herself contained no account numbers or client names.  Nor apparently did it break down the asset figures by account; instead, it contained just a single dollar figure representing the total assets in each particular hedge fund for all of Lee's clients combined.  Furthermore, Neithercut testified that she believed the information fell into an exception to the

Protocol, which permits a broker to reveal "information related to the RR's business, other than account statements, so long as that information does not reveal client identity." (Protocol at 2.) Credit Suisse, however, argues that if Neithercut's conduct is permitted to fall into this exception to the Protocol, a loophole would be created that one "could drive a truck through." The Court, however, is not suggesting that every instance of this type of conduct should fall into the exception. Indeed, there may well be situations where a broker takes with her such extensive and detailed "information related to the RRs business," (Protocol at 2), that the broker's conduct could not be said to be taken in good faith, thus depriving the broker of the benefits of the Protocol. This, however, is not one of those situations. The information Neithercut took did not jeopardize client privacy (indeed, it would seem extraordinarily difficult to determine which specific clients out of the approximately 150 clients serviced by respondents invested in any of the funds at issue), nor does it appear that the information, given its quite limited scope, would give respondents or Merrill Lynch any distinct advantage in competing for those clients' business. Without addressing whether Neithercut's acts violated a common law fiduciary duty, the Court cannot say that Neithercut failed to substantially and in good faith comply with the Protocol based on the fact that she emailed this information to her personal account.

      The same is true with respect to Lee. On December 3, 2011, in preparation for this preliminary injunction hearing, Lee discovered on his computer a file that contained portfolio information for one of his clients. Lee received the file on September 21, 2011 as an attachment to an email from respondent Gould. Lee testified that he needed the file to conduct a conference call with that client from home on September 21 and that he deleted the email after the call. Lee further testified that the file remained on his computer but that, according to the computer's records, it had not been opened since September 21. Lee's testimony revealed that he is rather

unsophisticated with computer technology, and the Court finds his testimony on his use of the September 21 email and file credible. Credit Suisse, however, points out that Credit Suisse policy prohibits employees from emailing Credit Suisse information to a personal email account. That may well be so, but that does not in itself amount to a violation of the Protocol. *See Reidy*, 477 F. Supp. 2d at 476 (finding that a violation of internal policy does not necessarily demonstrate a violation of the Protocol). Accordingly, Lee did not violate the Protocol by receiving in his personal email a client document.

Finally, Credit Suisse contends that respondents violated the Protocol by having Credit Suisse's back office generate performance reports for certain client accounts and then sending those reports to the clients immediately prior to the respondents' resignation. Credit Suisse does not contend that this activity violates the precise terms of the Protocol, but rather that it violates the "spirit" of the Protocol. Credit Suisse argues that respondents forced these reports to be sent out earlier than usual in a bad faith effort to circumvent the limits of the Protocol. Indeed, in support of its position, Credit Suisse points to the fact that Neithercut misrepresented facts to a back office employee—telling the employee that the reports were needed for a meeting at the end of the week when Neithercut knew no meeting actually was scheduled—to ensure that the employee would produce the report before respondents resigned. Neithercut admits making this misrepresentation, but both she and Lee testified that the reports were generated in the interests of their clients and in the ordinary course of business. They both admit, however, that their impending departure was a factor in requesting the reports.

Credit Suisse relies heavily on *Morgan Stanley & Co. v. Choy*, 08 Civ. 00467 (D. Haw. 2008)[4] to support its argument that a violation of the "spirit" of the Protocol is enough to deny a

---

[4] A copy of the *Choy* decision is attached as Exhibit A to Petitioner's Memorandum of Law in Support of Expedited Discovery.

departing broker of its protections. In *Choy*, the U.S. District Court for the District of Hawaii granted a preliminary injunction prohibiting the defendants, former employees of Morgan Stanley, from soliciting Morgan Stanley clients in large part because the defendants had violated the "spirit" of the Protocol. Immediately prior to their resignation from Morgan Stanley, the defendants in *Choy* took physical files from the Morgan Stanley office and mailed the files to their clients along with cover notes requesting the clients to keep the information for their next meeting. *Id.* at 9-10. The files contained historical performance records for each client's accounts, but also contained Morgan Stanley operational material, such as contracts, authorization forms, and cancelled checks. *Id.* at 11. The defendants, however, asserted that they did not intend to send the operational material to their clients. *Id.* In addition, the Protocol List that the defendants submitted to Morgan Stanley upon their resignation was intentionally formatted to hinder Morgan Stanley's efforts to properly use it. *Id.* at 19. In addition, it may have been incomplete. *Id.* The court found that "[t]he mailings to clients may not have violated the exact words of the Protocol, but they appear to have violated the spirit of the Protocol." *Id.* at 18. The court based its conclusion on the facts that (1) the mailings contained information which a broker could not himself take under the Protocol, (2) the timing of the mailings (and one of the defendant's testimony that he would not have made the mailings if he had not planned to resign), (3) the mailings were not approved by compliance, and (4) the Protocol List given to Morgan Stanley was intentionally formatted poorly and may have been incomplete. *See id.* at 12, 18-19. Credit Suisse argues that the same facts are present here and that this Court likewise should find that the Protocol has been violated. *Choy*, however, is factually distinguishable and ultimately unpersuasive.

11

In *Choy*, unlike in this case, the defendants took physical files and mailed them to their clients, thus leaving Morgan Stanley without the files and without the information contained therein. Here by contrast, respondents emailed electronic versions of the reports to their clients and there is no suggestion that Credit Suisse lacked equal access to the reports. With respect to the Protocol's concern for creating an "even playing field," (McGranahan Decl. ¶ 28), between departing brokers and their former firms, there surely is a difference between an empty filing cabinet that sends the former employer scrambling to recreate the missing documents and a handful of electronic reports to which the former employer has equal access. In addition, Credit Suisse makes no suggestion that respondents in any way formatted their Protocol list so as to hinder Credit Suisse in its efforts to retain Lee and Hoesley's former clients.

Furthermore, the "spirit" of the Protocol is to "further the clients' interests of privacy and freedom of choice in connection with the movement of their [brokers] between firms." It also is designed to ensure some measure of an "even playing field," (McGranahan Decl. ¶ 28), when brokers and their former firms compete for clients. Respondents' efforts to send out reports to their clients prior to their resignation does not substantially undermine either of those purposes. The clients' interests in account privacy are not undermined by respondents' conduct because the reports were sent only to the clients themselves (although Lee was cc'd on his Credit Suisse email), and, as Neithercut testified, the information in the reports was too voluminous for anyone to memorize. Thus, the only individuals outside Credit Suisse with access to the clients' information were the clients themselves, who at all times remained free to meet, or not meet, with Lee and his team as they so chose. Lee and his team had no special information that would have allowed them to leverage their new position by making an unsolicited pitch targeted at a particular client's needs, as gleaned through improperly retained client information. Thus,

12

respondents' conduct poses close to no risk of undermining the Protocol's goal of furthering client privacy. Nor can Credit Suisse seriously contend that a client's possession of his own account information puts Credit Suisse at a serious competitive disadvantage when Credit Suisse does not suggest that it lacked access to the same information. Finally, unlike account statements, which must be submitted to a transferee firm in order to transfer an account, these performance reports were insufficient on their own to allow a client to transfer his or her account from Credit Suisse to Merrill Lynch. Thus it appears that to initiate the transfer, the client would have been required either to wait for or to request from Credit Suisse an account statement, which would seem to give Credit Suisse the opportunity it desires to vie for that client's business.

The Court is not persuaded that the respondents exhibited bad faith in violation of the "spirit" of the Protocol, and absent sufficient evidence of a violation of the Protocol's terms, the Court declines to deny the respondents of its protections. Accordingly, the respondents solicitations of their former Credit Suisse clients is proper under the Protocol and Credit Suisse's motion to enjoin the respondents from further permissible solicitation is denied.

In reaching this conclusion, however, the Court does not suggest that the respondents fulfilled all of their obligations to Credit Suisse, fiduciary or otherwise. Indeed, the Protocol does not immunize a departing broker from all liability to his former firm. By its terms, the Protocol only absolves a departing broker from liability for conduct relating to "the RRs taking the information identified [in the Protocol] or the solicitation of the clients serviced by the RR at his or her prior firm." (Protocol at 1.) In other words, a departing broker who complies with the Protocol may invoke its protections to avoid liability to his prior firm arising out of his solicitation of the former firm's clients, but he nonetheless may remain liable to his former

13

employer for other wrongful conduct. That may turn out to be the case here. Those issues, however, will be resolved in arbitration. The issue here is whether the Court should enjoin respondents from continuing to solicit Credit Suisse customers they serviced while at Credit Suisse. Because, as discussed above, that solicitation itself is permissible under the Protocol, the Court finds no reason to issue a preliminary injunction in that regard.

With respect to the other terms of Credit Suisse's proposed preliminary injunction, they are denied. Given that the Court has found that respondents' post-resignation solicitation was, and continues to be, permissible, the Court declines to force respondents to stop working at Merrill Lynch. *Cf. Credit Suisse Securities (USA) LLC v. Ebling*, No. 06 Civ. 11339, 2006 WL 3457693, at *4 (S.D.N.Y. November 27, 2006) (declining to enforce provision of preliminary injunction prohibiting respondent from working at any entity other than Credit Suisse where respondent already had begun working at Morgan Stanley). With respect to Credit Suisse's request to enjoin respondents from soliciting other Credit Suisse employees, Credit Suisse has not made a sufficient showing that it will suffer irreparable harm absent an injunction to that effect. Finally, Credit Suisse's request to order respondents to turn over any Credit Suisse information in their possession is denied because, while Credit Suisse may have shown that respondents took some Credit Suisse information (i.e. mutual fund ticker symbols, the names of three hedge funds with the assets invested in each, and biographies of each of the respondents), Credit Suisse has not shown that it will suffer irreparable harm if this limited information is not immediately returned.

## CONCLUSION

For the reasons stated above, Credit Suisse's petition for a preliminary injunction [1] is DENIED. In addition, because Credit Suisse has informed the Court that it has filed an arbitration proceeding before FINRA, respondents' motion to compel arbitration before FINRA [18] is DENIED as moot. The clerk is directed to close this case.

SO ORDERED.

Dated: New York, New York
       December 9, 2011

_____
Richard J. Holwell
United States District Judge